# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## ON MOTION FOR REHEARING

========================

### NO. 03-05-00275-CV

**Jackie Doss Smith, Appellant**

**v.**

**Virginia Lagerstam, Emil Lagerstam, Kathryn Lagerstam Wilbeck,
Vivian Lagerstam Savage, and Annika Lagerstam Kaye, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. GN402753, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellant Jackie Doss Smith has filed a motion for rehearing. We withdraw our opinion, dissenting opinion, and judgment issued on June 1, 2007, and the following opinions and judgment are substituted. We overrule Smith's motion for rehearing.

Jackie Doss Smith sought to rescind three deeds under which she conveyed her royalty interest to her cousins, Kathryn Lagerstam Wilbeck, Vivian Lagerstam Savage, and Annika Lagerstam Kaye (the "Lagerstam daughters"). Smith requested that the court invalidate the deeds on the grounds of mutual and unilateral mistake because, at the time of the transaction, the parties were mistaken regarding the interest that was conveyed. In response, the Lagerstam daughters and

their parents, Virginia and Emil Lagerstam (collectively the "Lagerstams"),[1] filed a motion for summary judgment, asserting that the elements of both types of mistake were not met. The district court granted the Lagerstams' motion for summary judgment, and Smith now appeals. We will affirm the judgment of the district court.

## BACKGROUND

Smith and her aunt, Virgina Lagerstam, inherited identical mineral interests to land in Robertson County, Texas. In 1984, Smith and Virginia leased their mineral interests to XTO Energy by separate oil and gas leases. XTO Energy subsequently created a pooled unit, which included Smith's and Virginia's interests. Smith and Virginia were each entitled to a .0009901 royalty interest on the production of oil from any wells on the pooled unit.

Smith and Virginia began to receive royalty payments in 1985 when the first well was completed. For several years the royalty payments amounted to less than $100 per year, but in 2002, a second well was completed and payments rose to $250-$300 per month. In 2003, payments again rose when a third well was completed. By the start of 2004, Smith and Virginia were receiving over $300 per month in royalty payments.[2]

On February 9, 2004, Smith received an unsolicited offer from San Saba Royalty to purchase her entire interest for $6,658.99. She had received other offers before, but this offer was considerably higher than any of the previous offers. Due to the large amount offered and the fact that Smith had recently learned her son owed over $6,000 in back taxes, she considered accepting the

[1] Due to the shared surname of the appellees, we will refer to them by their first names where necessary to avoid confusion.

[2] The January and February 2004 royalty checks were $329.90 and $353.85, respectively.

2

offer. Consequently, Smith phoned Virginia, who Smith assumed had received the same offer, in order to discuss her options. Virginia stated that she would purchase Smith's royalty interest for the same price and explained that she wanted to give the interest to her three daughters. Desiring to keep the interest in the family and to help her son, Smith agreed to Virginia's offer. On March 9, 2004, Smith executed three deeds, conveying her entire interest to the Lagerstam daughters for $6,660.

In January and February 2004, just prior to the sale, two additional wells were installed on the pooled unit. However, due to the lag between oil production and royalty payments, neither party had received royalty payments from these two wells at the time of the sale. For several months after the sale, Smith continued to receive royalty payments for the oil production that occurred prior to the sale. These post-sale payments reflected the production from the additional two wells and were for the amounts of $510.10 in March, $1,025.90 in April, and $974.85 in May. After receiving these payments, Smith claims she attempted to verify their accuracy but was unsuccessful in contacting XTO Energy.

In June 2004, Smith received a transfer order from XTO Energy, indicating that she had successfully transferred her entire interest, including her interest in production from the two new wells, to the Lagerstam daughters. On that same day, Smith received another purchase offer from San Saba, this one for $62,651.38. After receiving this offer, she contacted Virginia and ultimately wrote a letter to the Lagerstam daughters, requesting that they sell her royalty interest back to her for the original purchase price of $6,600 plus interest. The Lagerstam daughters refused.[3]

---

[3] It is worth noting that after the sale had completed and before receiving the second offer from San Saba, another company offered to purchase Virginia's mineral interest for $1,087.50.

3

Smith then filed suit to rescind the three deeds on the grounds that the deeds were entered into under a mutual or a unilateral mistake. Specifically, she asked that the transfer be rescinded because, at the time of the conveyance, she was unaware that additional gas wells had been placed on the property. As a result, she insists that she was mistaken about the interest she was conveying. In response, the Lagerstams filed a motion for summary judgment, contending that the deeds should be upheld because there was no mistake, mutual or otherwise, regarding the interest that was sold. The district court granted the motion, and Smith appeals the district court's judgment.

## DISCUSSION

### Summary Judgment Motion

On appeal, Smith contends that the district court erred when it granted the Lagerstams' motion because fact issues were present regarding whether the deeds should be rescinded on the basis of a mutual or unilateral mistake. Before addressing the merits of this case, we need to address the dissent's concerns regarding the Lagerstams' summary judgment motion. Essentially, the dissent attacks the adequacy of the Lagerstams' motion on the basis of its length and its lack of citation to case law.

Although the Lagerstams' motion asserted that the Lagerstams were entitled to relief under both traditional and no evidence summary judgment standards, the motion is more properly read as a traditional motion for summary judgment because it did not specify which elements of Smith's claims there was no evidence for and because it referred to evidence attached to the motion as proof that the Lagerstams were entitled to relief as a matter of law. *See* Tex. R. Civ. P. 166a(i) (in no evidence motion, movant "must state elements as to which there is no evidence.").

4

Accordingly, we will limit our discussion to the requirements of traditional summary-judgment motions and need not address the dissent's assertions that the motion fails as a no-evidence summary judgment motion.

We first note that Smith did not contest the adequacy of the motion to the trial court and raises no issue regarding the sufficiency of the motion on appeal. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342-43 (Tex. 1993) (holding that in order for non-movant to complain on appeal that grounds raised in motion for summary judgment were unclear, non-movant must file exception to motion); *Lochabay v. Southwestern Bell Media, Inc.*, 828 S.W.2d 167, 170 n.2 (Tex. App.—Austin 1992, no writ) (same). Assuming without deciding that it is proper in this case to review the sufficiency of the motion when neither party has asked us to, we believe that the motion satisfies the requirements of a traditional summary judgment motion.

The motion is admittedly brief; however, to be effective, the motion need only list the grounds upon which relief is requested, and the specified grounds may be stated "concisely, without detail and argument." *Lochabay*, 828 S.W.2d at 170 n.2 (affirming summary judgment motion on deceptive trade practice grounds when motion simply stated that non-moving party's counterclaim "citing [the movant's] use of deceptive trade practices is wholly unsupported by legal authority."). The motion stated that Smith is not entitled to relief on the grounds of unilateral or mutual mistake. Further, the Lagerstams attached several documents to their motion for summary judgment, including Virginia's affidavit, an offer letter from San Saba, and the deeds conveying Smith's interest to the Lagerstam daughters. In their motion, the Lagerstams referred to the attached evidence and stated that the evidence "conclusively establishes" that the Lagerstams "never intended for their purchase to be anything other than for the entire interest owned by" Smith and that Smith

5

"never said or did anything to indicate that the sale was supposed to be a transfer only of an interest that involved a certain number of existing wells."

In light of the preceding, the motion falls far short of the type of motions that have been held ineffective because they presented no grounds for consideration. *See, e.g., McConnell*, 858 S.W.2d at 338, 341 (holding that summary judgment that only stated there were "no genuine issues as to any material facts" was insufficient); *Bean v. Reynolds Realty Group, Inc.*, 192 S.W.3d 856, 859 (Tex. App.—Texarkana 2006, no pet.) (holding that motion that stated only that "there is no evidence to support the plaintiff's causes of actions and allegations" was ineffective); *Great-Ness Prof'l Servs., Inc. v. First Nat'l Bank*, 704 S.W.2d 916, 917 (Tex. App.—Houston [14th Dist.] 1986, no writ) (holding that motion was ineffective in breach-of-lease case because motion made no mention of breach-of-lease claim and, instead, stated as its only ground that "[t]his is a suit on a sworn account.").

For all the reasons previously given, we conclude that the Lagerstams' motion for summary judgment was effective. We now turn to the standard with which appellate courts review district court determinations regarding summary judgment motions. A summary judgment may be upheld only if no genuine issue of material fact exists. Tex. R. Civ. P. 166a(c). To establish that no genuine issue of material fact exists, a defendant moving for summary judgment must disprove at least one element of the plaintiff's cause of action. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *Arbelaez v. Just Brakes Corp.*, 149 S.W.3d 717, 719 (Tex. App.—Austin 2004, no pet.). In reviewing the summary judgment evidence, all evidence favorable to the nonmovant must be taken as true. *Johnson*, 891 S.W.2d at 644.

**Mutual Mistake**

In her first issue on appeal, Smith claims that there was a fact issue as to whether there existed a mutual mistake warranting rescission of the deeds. Smith argues that the parties entered the sales contract under the mistaken belief that she was selling, and the Lagerstams were buying, only three producing wells. This mistake about the number of producing wells, she contends, materially affected the sales transaction and caused her to sell her interest for between 11% to 25% of its true value.[4]

Under Texas law, when parties to an agreement have contracted under a mutual misconception of material fact, the agreement is voidable under the doctrine of mutual mistake. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). However, the doctrine of mutual mistake is applied only in rare circumstances in order to allow parties to "rely on the finality" of their agreements and to prevent the routine use of the doctrine to avoid the effects of an "unhappy bargain." *Id.* at 265; *see Wallerstein v. Spirt*, 8 S.W.3d 774, 781 (Tex. App.—Austin 1999, no pet.). A mutual mistake must be proven by "clear, exact, and satisfactory evidence." *Estes v. Republic Nat'l Bank*, 462 S.W.2d 273, 275 (Tex. 1970) (citing *Sun Oil Co. v. Bennett*, 84 S.W.2d 447, 452 (Tex. 1935)). To be entitled to rescind an agreement due to a mutual mistake, a party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange. *Wallerstein*, 8 S.W.3d at 781; *De Monet v. PERA*, 877 S.W.2d 352, 357 (Tex. App.—Dallas 1994, no writ). "[T]he mistake must relate to the subject matter of the contract and not to a matter that is merely collateral or incidental to the contract." *Petrey v. John F.*

---

[4] This estimate is based on San Saba's offer to purchase the interest for $62,651.38, made after the sale, and on testimony that the interest was worth $28,000 at the time of sale.

7

*Buckner & Sons*, 280 S.W.2d 641, 643 (Tex. Civ. App.—Waco 1955, writ ref'd n.r.e.); *see also De Monet*, 877 S.W.2d at 359 (relief only appropriate where mistake upsets basis of contract); *Chambers v. Huggins*, 709 S.W.2d 219, 224 (Tex. App.—Houston [14th Dist.] 1986, no writ) (requiring party show that mistake was mutual and that it was material inducement to transaction).

When determining whether there was a mutual mistake, courts must consider the language of the agreement. *See, e.g.*, *Sun Oil Co.*, 84 S.W.2d at 449 (refusing to invalidate lease on ground it mistakenly included particular tract of land, where intent to include land in controversy "clearly and unmistakably appear[ed] from the language of the lease"); *see also Estes*, 462 S.W.2d at 275 (presume written agreement embodies parties' intentions). However, the existence of a mutual mistake cannot always be determined exclusively by the language in a contract. *Williams*, 789 S.W.2d at 264. In such cases, other objective circumstances surrounding the execution of the document may also be considered. *Id.* ("the question of mutual mistake is determined not by self-serving subjective statements of the parties' intent . . . but rather solely by objective circumstances"). These include the knowledge of the parties and the substance of the negotiations at the time of the contract execution. *De Monet*, 877 S.W.2d at 358; *see Williams*, 789 S.W.2d at 264. Essentially, the party seeking reformation due to mistake must show what the true agreement between the parties was and must prove that the written agreement does not comport with the true agreement because of a mutually held mistake. *Estes*, 462 S.W.2d at 275; *Beyers v. Roberts*, 199 S.W.3d 354, 362 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

Even when the evidence is viewed in the light most favorable to Smith, it fails to create a fact issue regarding whether there existed a mutual mistake materially affecting the agreement. The relevant language of the deeds reads as follows:

all of [the] Grantor's interest in and to all oil, gas, minerals and royalties, including, but not limited to, a 0.0009901 royalty, mineral interest, royalty interest, leasehold interest, reversionary interests, after acquired property interests, rights of substitution, rights of entry and re-entry, interests in claims or causes of action, rights of subrogation, regardless of whether any of such rights, titles and interests are vested now or will be vested in the future . . . .

The language in the deeds is broad. Rather than specifically delineate or limit the interest to be conveyed, the deeds outline a comprehensive, non-exhaustive list of what is to be included in the conveyance. It lists Smith's specific mineral interest in the property but also conveys any other interest Smith might have in the property. There is no indication in the language of the deeds that the parties intended to convey anything other than Smith's entire interest, whatever that might have been, including her stake in the production from whatever wells were on the property at the time of the conveyance. The deeds do not limit the interest to be conveyed to any number of wells and, in fact, make no mention of wells. *Cf. Sun Oil Co.*, 84 S.W.2d at 452 (language of deed written broadly for purpose of ensuring entire interest conveyed and preventing grantor from retaining any interest in property due to lack of precision in describing property or lack of knowledge of totality of interest by parties).

Second, although documents at the time of the sale indicate that only three wells were producing, the evidence concerning the various discussions and negotiations between Smith and Virginia demonstrate that the parties understood themselves to be buying and selling Smith's entire mineral interest. In Smith's deposition, she admitted that she understood the San Saba offer to be for her entire interest and further admitted that she intended to sell the Lagerstams the exact interest she would have sold to San Saba. San Saba's offer letter made no mention of any wells; on the

9

contrary, the offer letter stated that the offer was for "any and all of the royalty interest that" Smith owned at the time of the offer. In addition to the letter, San Saba attached a document that would have allowed Smith to transfer her ownership to San Saba. Like the offer letter, this document did not list any wells. Moreover, contained within the document was the following phrase written in a font that was significantly larger than fonts used for the other parts of the document: "BY EXECUTING AND DELIVERING THIS INSTRUMENT YOU ARE SELLING YOUR ENTIRE MINERAL AND ROYALTY INTEREST IN THE PROPERTY DESCRIBED ABOVE."

Although in her affidavit Smith says she believed her interest included the production from only three wells, nothing in the record suggests that Smith attempted to convey only three wells or to limit the conveyance in any way. Moreover, nothing in the record suggests that the parties negotiated regarding the number of wells on the property. On the contrary, in her deposition Smith admitted that she did not communicate a desire to convey only her interest in three wells. Further, Virginia's affidavit states that neither party mentioned the number of wells prior to the sale, and this testimony was not controverted.

In support of her argument that the mistake was material, Smith relies on a comment and an illustration accompanying section 152 of the restatement of contracts. Section 152 provides, in relevant part, as follows:

> (1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake . . . .

Restatement (Second) of Contracts § 152 (1981). The first illustration to this section provides as follows:

A contracts to sell and B to buy a tract of land, the value of which has depended mainly on the timber on it. Both A and B believe that the timber is still there, but in fact it has been destroyed by fire. The contract is voidable by B.

*Id.* § 152, illus. 1. Smith asserts that this case involves the reverse of the situation described in this example. Specifically, she contends that, because the addition of the wells increased the value of the property, she should be allowed to rescind her conveyances.

Our case is not analogous to this example. The example addresses what happens when there is a mistake about the very essence of what is sold—a bare tract of land versus timberland. There is no such basic mistake in our case: both parties believed they were dealing with a mineral interest, and both parties knew that the land was actively producing minerals. Moreover, a mistake in the number of wells conveyed does not render the essence of the exchange—the conveyance of an active mineral interest—inherently different from the intended conveyance. The Restatement example would be more applicable if the mistake in the illustration was about the number of trees on the lot rather than the existence of any trees at all. Finally, the example cited by Smith does not address the situation here where the seller wants to undo a transaction due to a mistake.

Comment b to section 152 reads, in relevant part, as follows:

The parties may have had such a "basic assumption," even though they were not conscious of alternatives. . . . Where, for example, a party purchases an annuity on the life of another person, it can be said that it was a basic assumption that the other person was alive at the time, even though the parties never consciously addressed themselves to the possibility that he was dead.

11

Restatement (Second) of Contracts § 152, cmt. b. However, as with the previous example, the situation described in the comment is not congruent to the circumstances present in this appeal. The basic assumption underlying the agreement in this case is that there was gas present on the pooled unit, not the precise value of the interest or the amount pumped from the pooled unit. This comment would have more applicability to a situation in which two parties believed that gas was present on the property when the sale was finalized but later discovered that the unit was dry.

In further support of her argument, Smith refers to two cases in which a court concluded there was a fact issue regarding the existence of a mutual mistake: *De Monet v. PERA* and *Williams v. Glash*. In *De Monet*, the parties entered into an agreement to sell an office building. 877 S.W.2d at 354. Prior to the sale, the sellers discovered that the building contained asbestos and hired a company to remove it. *Id.* at 355. The parties extensively negotiated regarding the removal of the asbestos prior to the sale being finalized, and the sellers made several representations that the asbestos would be removed prior to the sale. However, the purchaser discovered asbestos in the building after the sale was finalized. Due to the various actions performed by the parties and the significant negotiations concerning the asbestos, the court concluded there was a fact issue regarding whether the sellers assumed the risk of there being a mistake regarding the asbestos or whether the mistake was so "fundamental to the parties' agreement" that it "materially altered the agreement." *Id.* at 359.

*De Monet* is distinguishable from this case. In *De Monet*, the sellers were required to engage in certain actions and warrant that they had completed those tasks before the buyers would agree to purchase the building, and the mistake both parties had was the belief that the action had been completed. In the present case, the parties did not negotiate regarding the number of wells

present on the property, and neither party made any representations regarding the wells. Furthermore, there was no action either party needed to complete before the Lagerstams would agree to purchase Smith's mineral interest, and accordingly, there is no mistake regarding any action engaged in by Smith: she agreed to sell all of her mineral interest to the Lagerstams for an agreed price, and subsequently conveyed the property to the Lagerstam daughters.

In *Williams v. Glash*, Williams was involved in a car accident but did not feel injured immediately after the accident and stated on her claim form that no one had been injured in the accident. 789 S.W.2d at 263. The other driver's insurance company agreed to pay to fix Williams's car. *Id.* During the various negotiations Williams had with the insurance company, neither she nor any of the company's employees mentioned a personal-injury claim. *Id.* Further, the code stamped on the check the insurance company gave Williams to repair her car signified that the case did not involve a personal injury. *Id.* However, the check did contain a release clause stating that the amount offered constituted a full settlement precluding future claims for property or personal-injury damages. *Id.* After depositing the check, Williams discovered that she had been injured in the accident. *Id.* Given the lack of knowledge of an injury at the time the release was signed, the absence of any negotiation concerning personal injuries, the amount of money offered, and the code on the check, the supreme court concluded that there was a fact issue as to whether the parties intended the release to cover personal injuries. *Id.* at 264.

Smith's reliance on this case is misplaced. In *Williams*, there was evidence that created a fact issue as to whether the parties intended the release to cover the unknown, personal-injury claims. This case does not involve a determination of whether an agreement entered into by the parties forecloses the possibility of asserting unknown future claims. Regardless of the number

13

of wells on the property, the dispute in this case involves only one known claim to one mineral interest.

The language of the deed and the objective circumstances surrounding the execution of the deeds all indicate that the subject matter of the conveyance was Smith's entire mineral interest, not the number of wells present on the pooled unit. Accordingly, any mistake concerning the number of wells did not materially affect the exchange.

Moreover, even if a mistake about the number of wells were material, relief would still be barred by the principle that a party to an agreement may not seek relief on the ground of mistake if the risk of the mistake is allocated to that party. *See Cherry v. McCall*, 138 S.W.3d 35, 40 (Tex. App.—San Antonio 2004, pet. denied). A party bears the risk of a mistake when "the risk is allocated to him by agreement of the parties." Restatement (Second) of Contracts § 154(a) (1981). The risk of a mistake was allocated to Smith by the terms of the deeds she signed. The terms specified that Smith agreed to sell "*all* oil, gas, minerals, and royalties, *including but not limited to*, a .0009901 royalty, mineral interest, royalty interests, . . . *regardless of whether any of such . . . interests are vested now or will be vested in the future*." (Emphasis added). Additionally, relief is also barred by the principle that a mistake must ordinarily not be due to negligence on the part of the petitioner. *See Commercial Standard Ins. Co. v. White*, 423 S.W.2d 427, 433 (Tex. Civ. App.—Amarillo 1967, writ ref'd n.r.e.); *see also* Restatement (Second) of Contracts § 154(b) (1981) (party assumes risk of mistake if he "is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient."). As discussed more thoroughly in the next section, despite the

14

fact that her royalty payments had increased significantly in recent years, Smith failed to ascertain or investigate the value of her interest prior to selling it to the Lagerstams.[5]

For all the reasons previously given, we conclude that the conveyance was not subject to rescission under the doctrine of mutual mistake and overrule Smith's first issue on appeal.

In addition to attacking the motion's adequacy, the dissent also improperly limits its discussion to one element of mutual mistake. In their motion for summary judgment, after generally stating that Smith may not employ the doctrine of mutual mistake and noting that a claim of mutual mistake involves proving several elements, the Lagerstams stated that "[t]he most basic element of this cause of action is that the mistake was MUTUAL." In light of this statement, the dissent reasons that this Court may only address whether Smith and the Lagerstams were mutually mistaken about the number of wells. In essence, the dissent argues that by specifically listing the word "mutual," the Lagerstams have only presented one element for consideration.

We see no reason to conclude that after generally stating that Smith may not rely on mutual mistake, the Lagerstams effectively conceded or waived the materiality requirement by individually listing the mutuality requirement. Moreover, were we to limit our conclusion in the same manner as the dissent, we would be ignoring one of the well-settled principles of summary-judgment jurisprudence. When, as here, a district court does not specify the grounds upon which it granted summary judgment, this Court must affirm the summary judgment if any of the grounds

---

[5] Our conclusion that the deeds are not subject to rescission is bolstered by Smith's admission on appeal that she would be unable to rescind the agreements if the wells had been added after the sale was completed. When making this statement, Smith necessarily admitted that she was not under the mistaken belief that the value of the property could not be increased by the addition of future wells.

15

presented to the district court are meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004). The Lagerstams claimed that Smith is not entitled to recovery under the doctrine of mutual mistake, and it is therefore appropriate for this Court to consider whether the difference in the number of wells was material to the transaction.

Furthermore, as mentioned previously, although the Lagerstams did not specifically use the word material in their motion, they did state that they "never intended for their purchase to be anything other than for the entire interest owned by" Smith and that Smith "never said or did anything to indicate that the sale was supposed to be a transfer only of an interest that involved a certain number of existing wells." By making these statements, the Lagerstams effectively argued that the exact number of wells was not material to the transaction at issue in this case.

**Unilateral Mistake**

In her second issue on appeal, Smith claims that there was a fact issue as to whether there existed a unilateral mistake necessitating rescission of the deeds. In order to obtain relief due to a unilateral mistake, the following requirements need to be satisfied: (1) the mistake must be "of so great a consequence that to enforce the contract as made would be unconscionable"; (2) it must "relate to a material feature of the contract"; (3) it "must have been made regardless of the exercise of ordinary care"; and (4) "the parties can be placed in status quo in the equity sense." *Taylor v. Arlington Indep. Sch. Dist.*, 335 S.W.2d 371, 373 (Tex. 1960); *see Zapatero v. Canales*, 730 S.W.2d 111, 114 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.). The party seeking relief has the burden of establishing all these elements. *Zapatero*, 730 S.W.2d at 114. Requiring that these elements be met prevents a merely dissatisfied party from seeking to set aside an agreement by

claiming that he did not understand the agreement he was signing. *Cf. Wheeler v. Holloway*, 276 S.W. 653, 654 (Tex. 1925).

Smith argues that all four elements are satisfied in this case. Specifically, she argues that her mistake regarding the number of wells was material to the contract and led to the unconscionable result in which she lost thousands of dollars. Further, she argues that she is willing to return the $6,600 the Lagerstams paid for the interest and that, therefore, rescission of the contract would place the parties in the position they were in prior to the sale. Moreover, she claims that her actions were not the result of a failure to exercise ordinary care that would prohibit rescinding the contract. She argues she has little knowledge regarding mineral interests, believed $6,600 was a reasonable price for the amount of royalty payments she received, and relied on the Lagerstams for advice on whether to sell her interest. Finally, she contends that her actions were reasonable under these circumstances.

We disagree with Smith for several reasons. In general, a party is not entitled to relief due to its unilateral mistake if the mistake was not known or induced by the other party. *Johnson v. Snell*, 504 S.W.2d 397, 399 (Tex. 1973); *Zapatero*, 730 S.W.2d at 114. Smith makes no claim that her mistaken belief was induced by the Lagerstams or that the Lagerstams knew the true number of wells on the property and realized Smith did not. *See Zapatero*, 730 S.W.2d at 114 (appellant not entitled to relief under doctrine of unilateral mistake because no evidence was presented showing that appellee knew of appellant's mistaken belief).

Moreover, even viewing the evidence in the light most favorable to Smith, we must conclude that the evidence presented disproves at least one of the required elements of Smith's

17

claim: that Smith's mistake would have been made regardless of the exercise of ordinary care.[6] Even though the royalty payments Smith received in the months before the sale stated that the payments were for production from three wells, the documents also specified that the payment was for gas production that had occurred months earlier. In other words, the documents did not provide an accurate assessment of activity that was currently happening on the unit either in terms of the amount of gas that was pumped or the number of wells that were active.

In addition, the number of wells present on the property has increased over time. From the time Smith began receiving royalty payments to the time of the sale, three wells were added to the property. Of these three wells, two were added in the two years preceding the sale. Even assuming that Smith never knew the number of wells on the property, Smith was aware that amount of her royalty payments had increased substantially. In the two years prior to sale, Smith's royalty payments increased by more than threefold. However, Smith made no effort to ascertain the number of wells on her property or determine the value of her mineral interest until after she sold her interest to the Lagerstams. *See Wheeler*, 276 S.W. at 654 (court concluded that because Holloway failed to engage in any effort to determine end point of property he acquired, he was not entitled to relief under doctrine of unilateral mistake: "The whole trouble in this case is that Hollway traded and investigated afterward. He should have reversed this procedure."); *Zapatero*, 730 S.W.2d at 114 (party cannot claim unilateral mistake concerning outstanding mineral interest because interest fully described in deed records); *see also Anderson Bros. Corp. v. O'Meara*, 306 F.2d 672, 677 (5th Cir.

---

[6] In light of our discussion of materiality in the previous section, we also conclude that the materiality requirement of a unilateral mistake is not met.

1962) (appellee not entitled to relief by unilateral mistake because, prior to purchasing equipment, he did not attempt to ascertain whether equipment was suited for his purposes). A party cannot obtain relief from an agreement as a result of a unilateral mistake if the party's "ignorance of the facts was the result of carelessness, indifference, or inattention." *Roland v. McCullough*, 561 S.W.2d 207, 213 (Tex. Civ. App.—San Antonio 1978, writ ref'd n.r.e.).

For all the reasons previously given, we conclude that the conveyance was not subject to reformation or rescission under the doctrine of unilateral mistake and overrule Smith's second issue on appeal.

**Response to the Dissent**

In arguing that, on the merits, summary judgment was improper in this case, the dissent ignores the clear warning articulated by the supreme court that courts should only sparingly allow bargains to be undone due to a mistake by one or more of the parties to an agreement. *Williams*, 789 S.W.2d at 265. It is not the job of the courts to ensure that all parties to a transaction equally benefit from their bargain or that the sale price of an item accurately reflects the true value of that item. For a variety of reasons, people often sell items for amounts that are significantly less than market value. Although the seller may lose the full benefit of the bargain, it is possible that, in the seller's eyes, that loss is well worth the benefit of quickly selling an asset. It is also possible that a seller may choose to exert absolutely no effort to ascertain the true value of the item before selling it to avoid the hassle of inspecting or appraising the property. Courts should tread carefully before entering into the business of determining whether, in hindsight, the benefit obtained by a

quick sale or by being able to sell an item without valuing an asset is equivalent to the difference between the market value and the sale price.

## CONCLUSION

Having overruled Smith's two issues on appeal, we affirm the judgment of the district court.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear;
   Dissenting Opinion by Justice Patterson

Affirmed on Motion for Rehearing

Filed:   July 19, 2007